OPINION
This case arises out of a series of contracts between appellant, Monotube Pile Corporation, and appellee, Union Metal Corporation, for the production and purchase of particular steel tubes. The contracts at issue sub judice were entered into in 1984, 1986 and 1990. The 1984 agreement involved the manufacturing equipment needed to make the particular steel tubes. Appellant agreed to sell the necessary manufacturing equipment to appellee in exchange for $500,000 and manufacturing services. At the end of a three year period, appellee was to resell the equipment to appellant. In 1986, appellant agreed to give up its right to buy back the equipment in exchange for manufacturing services for the next thirteen years. The 1990 agreement involved an increase in price for the tubes and included a premium to appellee if it manufactured tubes in accordance with appellant's requirements.
In January of 1995, appellee limited appellant to 300 tubes per week. When appellant requested 326 tubes for a week in February of 1997, appellee refused to produce more than 300 tubes. As a result, on February 26, 1997, appellant filed a complaint against appellee for declaratory judgment, specific performance and damages. Appellee filed an answer and counterclaim on March 19, 1997.
A bench trial commenced on April 30, 1997. By judgment entry, findings of fact and conclusions of law filed May 16, 1997, the trial court denied appellant's declaratory judgment and specific performance claims, and dismissed appellant's damage claim and appellee's counterclaim.
Appellant filed a notice of appeal on June 11, 1997 and appellee filed a cross-appeal on June 18, 1997. This matter is now before this court for consideration. Assignments of error are as follows:
I
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY APPLYING RULES OF CONSTRUCTION TO CONTRADICT THE TERMS OF THE 1986 AND 1990 AGREEMENTS.
II
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS DETERMINATION OF THE HISTORICAL DEALINGS OF THE PARTIES.
III
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS APPLICATION OF O.R.C. § 1302.19(A).
IV
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO GRANT SPECIFIC PERFORMANCE.
V
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY CONSIDERING EVIDENCE REGARDING IMPOSSIBILITY OF PERFORMANCE.
CROSS-ASSIGNMENT OF ERROR I
 THE TRIAL COURT DECISION THAT THE AGREEMENTS WERE ENFORCEABLE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 I, II, III, IV, V
Appellant claims the trial court erred in interpreting the contracts which by their precise language did not need to be interpreted. We agree.
By judgment entry filed May 16, 1997, the trial court determined the following:
 The parties' business arrangement has continued to the present date with several further modifications in the various agreements. None of these modifications deal with any maximum or minimum quantities as it relates to any firm contractual requirement concerning same.
* * *
 * * * the Court feels the contract is silent as to the number of units to be provided. The contract is also silent as to whether the Plaintiff may require the Defendant to provide an indefinite or unlimited amount during any given time period. The contractual agreements are not simply ambiguous on this point, but they are actually silent on this particular point.
From this determination, the trial court used R.C. 1302.19
and the official comments to U.C.C. § 2-306 to look at the historical dealings of the parties and concluded the following:
 Based on the contractual language and the historical dealings of the parties, this Court finds that the UMC is required to provide up to 300 units per week under the scheduling terms listed in the agreement. * * * The Court finds that to interpret this contract as an unlimited contract from the standpoint of MPC would not be correct and is not commercially reasonable to so expect. The Court, therefore, interprets the parties' contract to include this maximum output requirement of 300 tubes per week.
 The Court further finds that the Plaintiff's claim for specific performance fails at this time. There has been no showing that UMC has failed to deliver the number of units ordered pursuant to the terms of the contact as indicated herein. * * *
 Based upon the Court's interpretation of the contract terms herein, the Court finds no merit at this time in the allegations of the counterclaim filed by UMC.
We find this approach to be legally flawed because of the language of the various agreements, and to be factually flawed because of the orders evidenced by Plaintiff's Exhibit 57.
The 1986 agreement superseded all "prior understanding, whether written or oral, between the parties hereto, including, without limitation, Articles XIII, XIV, XV, and XVI of the 1984 Agreement, except as otherwise expressly provided herein." See, Section 15. Section 1 states appellee agrees, for a period of thirteen years commencing August 1, 1985 "to fabricate and produce from MT's raw materials, such tapered piles, pile extensions, steel pile sections * * *, and steel pile extensions * * *, as MT, from time to time, will order from UMC." Section 8 states appellee agrees "to accept and schedule all of MT's orders on a priority basis insofar as such orders involve the use of the Number 2 Fluting Machine, ahead of all other customers of UMC whose orders may involve the use of such machine." This agreement concluded with the language "[t]his Agreement may not be amended or modified except by further written agreement signed by each party." See, Section 15.
In 1990, the parties entered into an agreement as an amendment to the 1984/1986 agreements. The amendment's purpose was as follows:
 The purpose of this amendment to the long-term contract between UMC and MPC dated May 19, 1984 (revised September, 1986) is to assure MPC that UMC will manufacture tubes in accordance with MPC's requirements for timely delivery, and to reward UMC for producing piling at scheduled rates and meeting MPC's delivery requirements. The effective date of this agreement is January 1, 1990. (only if signed by January 31, 1990).
The amendment provided for a "Premium Rate Schedule" as follows:
 Build Rate: Tubes/Week Premium Earned in the Form of Completed Piles (% of Billing)
1 — 400 5% (normal production)
401 — 600 15%
601 — 750 20%
751 — Up 25%
Computing Bonus Earned
 For example, if 650 tubes are scheduled and built in a given week; the bonus for the week will be calculated as follows:
[ (400) 5% + (600-400) 15% + (650-600) 20%] /650 = 9.2308%
* * *
 When the week to week scheduled production rate changes from one premium bracket to a different bracket, advance notification of one week for each bracket change plus one week for scheduling will be given by the purchaser.
 For example, if scheduled tube production moves from 390 in week `n' to 610 in week `n+1', three weeks advance notice would be required (i.e., two week for bracket change and one week for scheduling.)
The precise language of the 1990 amendment provided for production amounts of over 751 tubes per week contrary to the trial court's determination the contracts were silent on quantity to be provided. The 1986 agreement limited appellee's production to output from a "Number 2 Fluting Machine." The 1990 amendment expanded this production limitation to provide incentives and penalties for appellee's failure to meet appellant's demand for tubes.
It is a well settled principle of contract law that the parties' intentions be ascertained from the contractual language. If a contract is clear and unambiguous, "then its interpretation is a matter of law and there is no issue of fact to be determined." Inland Refuse Transfer Co. v. Browning-FerrisIndustries (1984), 15 Ohio St.3d 321, 322. A court cannot in effect create a new contract "by finding an intent not expressed in the clear language employed by the parties." Alexander v.Buckeye Pipe Line Co. (9178), 53 Ohio St.2d 241, 246.
As cited supra, the trial court factually concluded the "maximum output requirement" was 300 tubes per week. The trial court based this conclusion by using a weekly historical average of "225 units per week or slightly above this amount." As Plaintiff's Exhibit 57 evidences, since the 1990 incentive agreement, production requests were made for 274 weeks with 89 of those weeks requesting tubes in excess of 300 (30.8%). We find this evidence factually contradicts the trial court's conclusion.
Based upon our review, we find the trial court erred in interpreting the contracts where no ambiguity existed, and in using R.C. 1302.19 in its analysis.
As a remedy, appellant sought specific performance. To be entitled to specific performance, one must show a valid binding contract, a breach of that contract and an inadequate remedy at law.
It is clear from the May 23, 1994 letter of appellee's vice president, Vincent R. Horning, (Plaintiff's Exhibit 8) that appellee unilaterally terminated the contracts with appellant:
 The agreement under which Union Metal Corporation (UMC) has been providing forming and fabricating services for Monotube Pile Corporation (MPC) is null and void. That agreement was negotiated in haste and under duress, and has been for all intents and purposes a financial subsidy of MPC by UMC throughout its life. This subsidy has been injurious to UMC for the past ten years and the amount of that injury more than compensates for any and all rights MPC may claim under the terms of the now canceled agreement.
This unilateral action is prohibited by the 1986 agreement and constitutes a breach of contract. It is undisputed the manufacturing equipment used to produce the tubes is unique. Such equipment is exclusively owned by appellee. The tubes are a unique product that can only be produced by appellee's equipment. Appellant is entitled to specific performance.
Appellant's assignments of error are granted.
 CROSS-ASSIGNMENT OF ERROR I
In its brief at 9, appellee claims the contracts are illusory and unenforceable:
 Due to the lack of obligation to purchase on behalf of Monotube, the agreement must fail as illusory. See GJ Pepsi Cola Bottling, Inc. v. Limbach (1990), 48 Ohio St.3d 31, 33. In GJ Pepsi, the Supreme Court of Ohio held that where a contract is not a requirements contract and the contract fails to establish consideration in form of an obligation to purchase specific quantities, the contract fails as being illusory. Id.; See also Modern Systems Technology Corp. v. U.S. (1980), 68 Ohio App.2d 126.
We do not find the holding and reasoning of GJ Pepsi to be applicable sub judice. GJ Pepsi centered on whether there was consideration and therefore a sale under R.C. 5739.01(B), not whether the base agreement was illusory. In its syllabus, the GJPepsi court held there is adequate consideration when there is legal detriment to the buyer:
 * * * adequate consideration exists for a rent-free transfer of beverage dispensing equipment, vending machines, coolers and related equipment to a retailer by a wholesale distributor of soft drinks when the retailer agrees to bear and assume all responsibility for destruction, loss or damage to the equipment. Further, when coupled with an excepted purpose on the part of the wholesaler to purchase such equipment for resale, R.C. 5739.01(E)(1) precludes a sales and use tax levy on the initial purchase of the equipment.
The trial court properly found appellee's claims to be without merit. In the 1984/1986 agreements, the legal detriment or consideration by appellant was to forebear on the purchase of the manufacturing equipment needed to make the particular steel tubes by purchasing the tubes from appellee as its "long term supplier."
Appellee's cross-assignment of error is denied.
The judgment of the Court of Common Pleas of Stark County, Ohio is hereby reversed. Appellant is entitled to specific performance.
By Farmer, P.J., Hoffman, J. and Wise, J. concur.
 JUDGMENT ENTRY
CASE NO. 1997 CA 00185
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Court of Common Pleas of Stark County, Ohio is reversed. Appellant is entitled to specific performance.